# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

HAITHEM HASAN,

                                        Plaintiff,

          v.                                                5:18-CV-806
                                                            (ATB)
ONONDAGA COUNTY, et al.,

                                        Defendants.

HAITHEM HASAN, Plaintiff, pro se
PATRICK R. BLOOD, Asst. Corp. Counsel for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to the undersigned for all further proceedings, including entry of judgment pursuant to 28 U.S.C. § 636(c) and the consent of the parties on May 16, 2019. (Dkt. No. 38).  Plaintiff filed this civil rights complaint against various defendants claiming excessive force, false arrest, and malicious prosecution in conjunction with his arrests on December 26, 2015, May 18, 2016, and August 7, 2016. Various defendants were dismissed following my March 30, 2020 Memorandum Decision and Order ("MDO") which addressed defendants' motions for partial judgment on the pleadings. (Dkt. No. 78).  Presently before the court is the remaining defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. Nos. 132-35).  Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt. Nos. 141, 144).

## I.    **Procedural Background**

Plaintiff filed his original complaint on July 19, 2018. (Dkt. No. 1)  The case

was administratively closed because of an insufficiency in plaintiff's application for in forma pauperis ("IFP") status. (Dkt. No. 2).  On July 11, 2018, the case was reopened after plaintiff filed a First Amended Complaint ("FAC"), together with the appropriate documents for a proper IFP application. (Dkt. Nos. 3-8).  On August 2, 2018, I reviewed the FAC and recommended[1] that some claims proceed while other claims and defendants be dismissed from the action. (Dkt. No. 9).

On August 15, 2018, while my August 2, 2018 Order and Report-Recommendation ("ORR") was pending before U.S. District Court Judge Gary L. Sharpe, plaintiff filed his Second Amended Complaint ("SAC"). (Dkt. No. 10).  On August 24, 2018, Judge Sharpe adopted my August 2, 2018 ORR in its entirety and construed plaintiff's August 15th filing as a motion to amend the FAC. (Dkt. No. 11). Judge Sharpe referred the motion to amend to me, and on August 30, 2018, I granted the motion in part, and denied the motion in part. (Dkt. No. 12).  On December 4, 2018, plaintiff substituted defendants Officers Robert Ripley and Jeremy Decker as the John Doe police officers in conjunction with the May 18, 2016 arrest.[2] (Dkt. No. 26). Defendants filed two motions for partial judgment on the pleadings. (Dkt. Nos. 50, 58). On March 30, 2020, I granted defendants' first motion and granted the second in part. (Dkt. No. 78).

As a result of my March 30, 2020 MDO, the following claims remain:

---

[1] At that time, the parties had not yet consented to proceed before me.  Thus, I was required to recommend any dispositive action in the case. 28 U.S.C. § 636(b).

[2] On May 16, 2019, plaintiff and defendants filed the consent to proceed before a Magistrate Judge, and the case was assigned to me for all further proceedings by Senior Judge Sharpe. (Dkt. No. 38).

(1) **December 26, 2015 Incident**:
    (A)    False Arrest, Excessive Force, and Malicious Prosecution against **Blake and Giarusso**.

(2) **May 18, 2016 Incident**:
    (A)    False Arrest, Excessive Force, and Malicious Prosecution against **Henderson, Ripley and Decker**.
    (B)    Excessive Force against **Fowler**.

(3) **August 7, 2016 Incident**:
    (A)    False Arrest against **King, Blake, Picotte, and Breen**.
    (B)    Excessive Force against **Blake and Picotte**.
    (C)    Malicious Prosecution against **Blake**.

(Dkt. No. 78, pp. 22-23). Attached to their summary judgment motion, defendants have filed substantial additional facts, depositions, affidavits, and video evidence in support of their argument that plaintiff's remaining claims should be dismissed. For the following reasons, this court agrees with defendants and will dismiss plaintiff's second amended complaint in its entirety.

## II.   Facts

The following is a summary of the facts as stated in the second amended complaint. To the extent that additional facts were developed through discovery, and included in the summary judgment motion, I will discuss them during my analysis of the remaining claims.

### A.   December 26, 2016

In the SAC, plaintiff alleged that he was at the Mobil Gas Station at 631 South

Geddes Street in Syracuse, New York with approximately 50 other individuals. (SAC ¶ 4 at pp.3-4).[3]  Plaintiff stated that a fight broke out, and "shots" were fired, but no one was injured. (*Id.* at 4).  Plaintiff alleged that, after the shots were fired, "everyone began to flee."  However, when the police arrived, plaintiff was still on the scene, just trying to make sure that his mother and other family members were okay. (*Id.*)

Plaintiff claimed that defendant Officers Blake and Giarusso approached him, stating "that's Hasan."  They grabbed plaintiff's arm when he refused to speak with them.[4]  Plaintiff stated that he "continued" to walk away, and defendants pursued him. (*Id.*)  Plaintiff alleged that the officers used excessive force to tackle him, bringing him to the ground.  They then kicked, punched, and used their sticks to beat plaintiff, while asking him why he ran away from them. (*Id.*)  Plaintiff stated that he explained to them that he had "every right" not to speak with the officers and "to be left alone."  Plaintiff alleged that the officers continued beating plaintiff as his family and friends watched. (*Id.*)  Plaintiff claimed that he suffered severe cuts, scrapes, and bruises to his face and body, which caused a substantial amount of pain for months. (*Id.* ¶ 4 at pp. 4-5).

Plaintiff was arrested as a result of this incident and was told that he was being charged with the "shots fired" incident. (*Id.* ¶ 4 at p. 5).  Plaintiff was held on substantial bail, and he was told that the prosecutor had "a witness." (*Id.*)  He was

---

[3] Plaintiff has numbered the pages of the SAC at the bottom-center of the page.  The court will refer to paragraphs and page numbers as assigned by the plaintiff to his pleading.

[4] The SAC actually states that "[d]efendants begin [sic] to grab plaintiff's arm after refusing to speak with him and plaintiff continue to walk away when defendants pursue plaintiff using excessive force." (SAC ¶ 4 at p. 4).  It is clear from the rest of plaintiff's factual recitation that he refused to speak with the officers and "continued" to walk away when they pursued him.

detained until February 24, 2016.  However, the grand jury did not indict him, and the charges against him were dismissed.  Plaintiff asserted claims of excessive force, false arrest/imprisonment, and malicious prosecution relating to this incident.

###    B.    May 18, 2016

Plaintiff claimed that on May 18, 2016, he was walking by a house at 309 Merriman Avenue, when he was falsely arrested and charged with criminal possession of a controlled substance in the third and seventh degrees. (SAC ¶ 5 at pp.5-6). Plaintiff stated that defendants Henderson and Ballagh had been investigating the Merriman residence for two months for "drug sales and violent conduct." (*Id.* at 6). Plaintiff alleged that he was not a "named" suspect in the investigation.  On May 18, 2016, approximately forty officers, who had arrived in a U-Haul truck and other unmarked vehicles were in the process of raiding and searching the residence. (*Id.*)

Plaintiff stated that he was arrested by defendants Henderson, Ripley, and Decker. (*Id.*)  Plaintiff claimed that these three defendants used excessive force in apprehending him.  They allegedly assaulted him and beat him "into the ground" until he lost consciousness.  Plaintiff was then handcuffed face-down on the ground for two hours.  Plaintiff accused defendant Henderson of continuing the "assault" even after plaintiff was face-down on the ground in handcuffs. (*Id.*)  Plaintiff alleged that family and friends "arrived" to see the chaos unfold and began to video tape the incident. (*Id.*) Plaintiff stated that Officers Timothy Gallanagh, Mamoun Abraham,[5] and defendant then-Chief of Police Frank Fowler witnessed the assault. (*Id.*)  Plaintiff claimed that

---

[5] Plaintiff did not name either Officer Gallanagh or Abraham as defendants, even though plaintiff did name former-Chief Fowler.

defendant Fowler was on the scene "taking names" and other "information," when he witnessed the assault. (*Id.* at 6-7).

Plaintiff stated that "another" officer arrived with a camera and asked plaintiff whether he needed medical attention, but that defendant Henderson "flinched" at plaintiff and told the other officer that plaintiff was "okay, he fell, ain't that right Mr. Hasan?" (*Id.* at 7).  Plaintiff alleged that he was afraid of defendant Henderson and therefore agreed with him. (*Id.*)  On May 19, 2016, while plaintiff was being arraigned on the charges, he discovered that he was also being charged with resisting arrest and obstruction of governmental administration. (*Id.*)  Plaintiff claimed that his attorney told him that he was being charged with these additional crimes to justify the assault. (*Id.*)  Plaintiff stated that the grand jury returned a "no bill" as to all the charges. Plaintiff asserted claims for excessive force, false arrest/imprisonment, and malicious prosecution relating to this incident.

### C.    August 7, 2016

Plaintiff claimed that he was unlawfully arrested in conjunction with an incident of "shots fired" at a Mobil gas station at 631 Geddes Street in Syracuse. (SAC ¶ 6 at pp.7-8).  Plaintiff stated that, at the time of the "shots fired" incident, he and two other individuals were on a different street, in a car which was parked in a driveway. (*Id.*) Plaintiff alleged that there was no complaint against him, his companions, or the vehicle in which they were sitting. (*Id.* at 8).

Plaintiff stated that defendant King arrived first at the Geddes Street location and reported "nothing of significance pertaining to the shots fired." (*Id.*)  Defendant King

6

left the Geddes Street location and drove to Merriman Avenue, where plaintiff and the two other individuals were seated in a car in the driveway. (*Id.*)  Defendant King turned his patrol car spotlight on the vehicle and saw all three occupants get out of the vehicle "and flee." (*Id.*)  Defendant King began to pursue plaintiff, while, at the same time, he radioed in plaintiff's name and described the clothing he was wearing. (*Id.*)  Plaintiff claimed that he was subsequently "detained" by defendants Blake and Picotte, who allegedly used excessive force in apprehending the plaintiff. (*Id.*)  Plaintiff stated that they punched him, kicked him, and placed him in extremely tight handcuffs.  They told plaintiff that he was being detained for trespass and left him in a patrol car for two hours with the heat turned up. (*Id.* at 8-9)

Plaintiff claimed that defendants Blake and Breen told plaintiff that, although he "beat" them in December of 2015, they had a weapon "this time." (*Id.* at 9).  The officers apparently found a gun or guns that had been abandoned when the individuals fled from the car.  Plaintiff alleged that the other two individuals who were in the car with him were apprehended and released, even though one of them confessed that the gun belonged to him. (*Id.*)  However, plaintiff claimed that defendant Breen later "coerced" the individual into stating that the gun belonged to plaintiff.  The other occupant in the car was on parole and "helped" defendant Breen locate a .40 caliber handgun in return for his release. (*Id.*)  Plaintiff stated that this information was discovered at his subsequent trial.  Plaintiff alleged that he was charged with criminal possession of a weapon, second degree. (*Id.*)

Plaintiff stated that he had a suppression hearing, at which defendant King

7

testified that he had no reasonable suspicion to link plaintiff with criminal activity on August 7, 2016 to justify his stop, pursuit, and seizure. (*Id.* at 10)  Plaintiff alleged that his attorney moved to dismiss the charges, but her motion was denied, and a trial date was set. (*Id.*)  Shortly before trial, plaintiff turned down a plea offer, and on November 17, 2017, plaintiff was acquitted after a jury trial. (*Id.*)  Plaintiff alleged that he was the victim of excessive force, false arrest/imprisonment, and malicious prosecution as a result of this incident. (*Id.* at 11).

## III.   **Summary Judgment**

### A.   **Legal Standards**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts

showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

Credibility assessments and the choice between conflicting versions of a story are generally for a jury to resolve. *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir. 1996). However, the Second Circuit recognized an exception to this rule in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). In *Jeffreys*, the court held that summary judgment may be granted in the rare case, "where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that 'no reasonable person' could credit . . . his testimony." *Quick v. Quinn*, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at *4 (N.D.N.Y. Sept. 11, 2014) (quoting *Jeffreys*, 426 F.3d at 54-55).

In order for the court to apply the *Jeffreys* exception, the defendant must satisfy each of the following: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' "(2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Id.* (quoting *Benitez v. Ham*, No. 04-CV-1159 (NAM/GHL), 2009 WL 3486379, at *20-

21 (N.D.N.Y. Oct. 21, 2009) (adopting report and recommendation) (quoting *Jeffreys*, 426 F.3d at 554)).  "[I]n excessive force cases, summary judgment is proper 'where undisputed medical records directly and irrefutably contradict a plaintiff's descriptions of his injuries, [because] no reasonable jury could credit plaintiff's account of the happening.'" *Rolkiewicz v. City of New York,* 442 F. Supp. 3d 627, 641 (S.D.N.Y. 2020) (quoting *Henry v. Officer Pierce*, No. 1:11-CV-845, 2017 WL 3610507, at *2 (S.D.N.Y. Aug. 21, 2017) (quoting *Davis v. Klein*, No. 11-CV-4868 (ENV), 2013 WL 5780475, at *4 (E.D.N.Y. Oct. 25, 2013)).

## IV.  <u>False Arrest</u>

### A.  **Legal Standards**

Claims for false arrest brought under Section 1983 are "'substantially the same'" as claims for false arrest under state law. *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)).  In order to establish a claim for false arrest under New York law, the plaintiff must show that "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Id.* (quoting *Jocks*, 316 F.3d at 134-35 (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975) (alterations in original)).

Probable cause to arrest is a complete defense to an action for false arrest. *Id.* (citing *Weyant*, 101 F.3d at 852).  "Officers have probable cause when they 'have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be

arrested has committed or is committing a crime.'" *Id.* (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)).  In order to determine whether probable cause existed, a court considers only the facts "'available to the officer at the time of the arrest and immediately before it.'" *Id.* (quoting *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)).

Probable cause is determined by the totality of the circumstances. *District of Columbia v. Wesby*, _ U.S. _, 138 S. Ct. 577, 586, 588-89 (2018).  Probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts. *Id.* at 588.  "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 244, n.13 (1983)) (internal quotation marks omitted).  Probable cause "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* at 586 (quoting *Gates*, *supra*) "Probable cause 'is not a high bar.'" *Id.* (quoting *Kaley v. United States*, 571 U.S. ___, ___, 134 S. Ct. 1090, 1103 (2014)).  "[P]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (1994); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

## B.    Analysis

### 1.    December 26, 2015 (Defendants Blake and Giarrusso)

At approximately 2:23 a.m. on December 26, 2015, defendants Syracuse Police Officers Ryan Blake, Kenneth Sheehan, and Sergeant Colin Hillman responded to a call

near the 300 block of Seymour Street in the City of Syracuse.[6] (Def.s' Statement of Material Facts ("SOF") ¶ 8; Affidavit of Officer Ryan Blake ("Blake Aff.")[7] ¶ 6; Affidavit of Sergeant Collin Hillman ("Hillman Aff.")[8] ¶ 6; Affidavit of Officer Kenneth Sheehan ("Sheehan Aff.")[9] ¶ 4).  Defendants refer to this area of Syracuse as the "West Side Neighborhood." (Def.'s SOF ¶ 8).  Upon arriving on Seymour Street, the officers heard six or seven shots coming from, several hundred feet down Seymour Street toward the intersection of South Geddes Street. (Def.s' SOF ¶ 8; Blake Aff. ¶ 6; Hillman Aff. ¶ 6).  Defendant Blake called out the gunshots over the radio and responded to the area of the gunshots along with several other Syracuse Police Units. (Def.s' SOF ¶ 8; Blake Aff. ¶ 7).  Officers Blake, Sheehan, and Sergeant Hillman proceeded toward the area of the gunshots. (Def.s' SOF ¶ 8; Blake Aff. ¶ 7; Hillman Aff. ¶ 7).

At the same time, another call was dispatched for a "shots fired" incident at the Geddes Express Mart, a gas station, located at 631 South Geddes Street. (Def.s' SOF ¶ 9; Blake Aff. ¶ 7; Hillman Aff. ¶ 7).  Several units arrived at the Geddes Express Mart at the same time. (Blake Aff. ¶ 7; Hillman Aff. ¶ 7).  As they arrived, the officers saw dozens of vehicles and possibly 100 people fleeing the scene on foot and in cars.

---

[6] Plaintiff agrees with, or does not contest, many of the defendants' statements of material facts. (Pl.'s SOF) (Dkt. No. 141). To the extent that plaintiff agrees with the facts as stated by defendants, the court adopts those facts in its analysis.  In addition, rather than repeating each fact to which plaintiff agrees, I will focus on the facts that plaintiff does dispute in my determination of whether those disputes are "material" for purposes of summary judgment.

[7] Defendants' Ex. J (Dkt. No. 132-13).

[8] Defendants' Ex. Q (Dkt. No. 132-20).

[9] Defendants' Ex. V (Dkt. No. 132-25).

(Def.s' SOF ¶ 10; Blake Aff. ¶ 7; Hillman Aff. ¶ 7).  As defendant Blake was attempting to determine if there were any gunshot victims, a clerk from the Geddes Express Mart approached Blake, pointed to an individual wearing a white t-shirt, and identified him as the shooter. (Def.s' SOF ¶ 11; Blake Aff. ¶ 8).  Defendant Blake states that Officer Sheehan and Sergeant Hillman were already speaking to the identified individual, who appeared to be agitated. (Def.s' SOF ¶ 16; Blake Aff. ¶¶ 9, 10; Hillman Aff. ¶¶ 8- 9; Sheehan Aff. ¶ 7).

As plaintiff was interacting with Sergeant Hillman and Officer Sheehan, defendant Officer J.M. Giarrusso and Officer Robert Jones III arrived on the scene and witnessed the discussion. (Def.s' SOF ¶ 17; Affidavit of J.M. Giarrusso ("Giarrusso Aff.")[10] ¶¶ 9-10; Affidavit of Officer Robert Jones, III ("Jones Aff.")[11] ¶ 8).  Both defendants Giarrusso and Jones knew of plaintiff's reputation and tendency to carry weapons. (Def.s' SOF ¶ 17; Giarrusso Aff. ¶¶ 2-7; Jones Aff. ¶ 3).  Defendant Blake informed the officers over the radio that the individual to whom they were speaking had been identified as the shooter, and that he was going to be arrested.[12] (Blake Aff. ¶ 9).  As soon as defendant Blake made the announcement over the radio, he observed the

---

[10] Defendants' Ex. O (Dkt. No. 132-18).

[11] Defendants' Ex. R (Dkt. No. 132-21).

[12] Plaintiff was well-known to the officers.  Defendant Blake was very familiar with the plaintiff from officer safety bulletins issued by the Onondaga Crime Analysis Center ("OCAC"), warning that officers should exercise caution when approaching plaintiff because he was likely to be armed. (Blake Aff. ¶ 2).  Officer Blake also learned more about plaintiff after his July 10, 2015 arrest for punching a woman and stabbing her sister. (Blake Aff. ¶¶ 2-5).  Officer Blake was involved in the investigation of the July 10th crime and assisted in plaintiff's subsequent identification for that crime, for which he was on bail at the time of the December 26, 2015 incident. (Def.s' SOF ¶ 12; Blake Aff. ¶ 3).

13

individual "brush[] off" Sergeant Hillman and start running across South Geddes Street toward a car wash. (Blake Aff. ¶ 9).

Sergeant Hillman states that, while officers were attempting to disperse the crowd and locate any victim, "a male" approached them and pointed to an individual, indicating that he was the shooter. (Hillman Aff. ¶ 8). Sergeant Hillman immediately recognized the plaintiff as the male who was being identified.[13] (*Id.*) Sergeant Hillman noticed that plaintiff was returning to the parking lot from Shonnard Street. (*Id.*) Sergeant Hillman quickly approached plaintiff and escorted him to the patrol car. (*Id.*) Sergeant Hillman states that as additional officers arrived at the scene, he attempted to speak with plaintiff, who appeared to be agitated and was very uncooperative. (Hillman Aff. ¶ 9). While attempting to speak with plaintiff, Sergeant Hillman was advised that the store clerk had positively identified the plaintiff as the shooter. (*Id.*) As soon as Sergeant Hillman heard this, he attempted to grab plaintiff's arm to take him into custody. However, plaintiff had also heard what was said over the radio, pulled away from Sergeant Hillman's grip, and began running west. (*Id.*)

Sergeant Hillman pursued plaintiff on foot with other officers and recalled commanding plaintiff to stop running. (Hillman Aff. ¶ 10). Plaintiff ran through an empty car wash bay and continued down a hill. (*Id.*) During the chase, Sergeant Hillman fell, once as he attempted to grab at plaintiff's clothes, and again after he got up and tried to continue chasing plaintiff down the hill. (*Id.*) Officer Blake joined the pursuit and recalled cutting around the corner of the car wash through a parking lot

---

[13] In fact, Sergeant Hillman stated that he considered the plaintiff to be "famous, due to his involvement in numerous shootings and drug-related incidents." (Hillman Aff. ¶ 5).

toward the 100 block of Amy Street. (Blake Aff. ¶ 10).  Defendant Blake saw that Mr. Hasan had been taken to the ground by other officers on the side of the street near a fence, with some broken cinder blocks and other debris littering the ground. (Blake Aff. ¶ 10).  Plaintiff was ultimately taken into custody, the details of which will be discussed below in the court's analysis of the force used for the arrest.

Plaintiff does not dispute most of the material facts associated with the probable cause to arrest him on December 26, 2015. (Pl.'s SOF ¶¶ 1-19).  Plaintiff concedes that he was "well-known" to the Syracuse Police Department and all the individual officer defendants in this case. (Pl.'s SOF ¶ 2; Def.s' SOF ¶ 2).  He concedes that the officers knew that plaintiff was "involved in numerous stabbings, shootings and drug-related incidents . . . ." (*Id.*)  Plaintiff does not dispute that his name was often mentioned in "shift briefing sessions," or that the Syracuse Police would gather information about him for distribution to officers on the force. (Pl.'s SOF ¶¶ 4-5).  Plaintiff agrees that he was convicted after a jury trial of the July 15, 2015 incident, which involved punching one woman, stabbing another, and escaping by taxi.[14]  Plaintiff also agrees that he was out on bail for the July 15, 2015 incident at the time of the December 26, 2015 incident, although plaintiff states that he continues to maintain his innocence of the July 15th charges. (Pl.'s SOF ¶ 6; Def.s' SOF ¶ 6).

Plaintiff does not dispute most of the facts leading to his arrest. (Pl.'s SOF ¶¶ 8-

---

[14] Defendants elaborate that plaintiff held the taxi driver at knife-point. (Giarrusso Aff. ¶ 7). Officer Joseph Szakacs, one of the first responders to the July 15th incident, states that he essentially rescued plaintiff from an angry crowd that stopped the taxi – likely seeking retribution for the stabbing – by pulling plaintiff from the taxi and escorting him away from the mob to a safe location. (Def.s' SOF ¶ 6 n.2) (citing Affidavit of Joseph Szakacs ¶¶ 3-6 ("Szakacs Aff.") (Def.s' Ex. W); Giarrusso Aff. ¶¶ 4-7; Affidavit of Kenneth Sheehan ¶3 ("Sheehan Aff.") (Def.s' Ex. Exhibit V).

10).  He agrees (or cannot dispute) that there were shots fired at the Geddes Express

Mart, that the officers were dispatched to the location, and that there was a large group

of people fleeing on foot and in cars when the officers arrived.  Critical to the

defendants' summary judgment motion, plaintiff states he cannot dispute that the

Express Mart store clerk, Satinder Singh, identified plaintiff as the shooter to defendant

Blake. (Pl.'s SOF ¶ 11).  While plaintiff disputes that he was aware that there had been

a positive identification by Mr. Singh (Pl.'s SOF ¶ 19), plaintiff's knowledge is

irrelevant to the issue of whether the *officers* reasonably suspected that plaintiff was the

perpetrator of the crime. *See Stansbury v. Wertman*, 721 F.3d at 89 (the court considers

information available to the *officer* at the time of the arrest and immediately before it).

In addition to the eyewitness, who identified plaintiff at the scene and

subsequently gave a written statement to the officers, plaintiff's behavior after the

officers attempted to arrest him may also be considered in the probable cause

determination as part of the "totality of the circumstances." *See District of Columbia v.

Wesby*, 138 S. Ct. at 587 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000)

("Unprovoked flight from the police 'is certainly suggestive' of wrongdoing and can be

treated as 'suspicious behavior' that factors into the totality of the circumstances.").

Although plaintiff disagrees that he "brushed off" Sergeant Hillman *after* he heard

defendant Blake announce his identification over the radio, plaintiff does *not* dispute

that he ran away from the officers and led them on a chase through the neighborhood.

Plaintiff disputes only that his attempt at running away was "prompted by the positive

identification."[15] (Pl.'s SOF ¶ 19).

Plaintiff's factual disputes[16] are not material, and Mr. Singh's eyewitness identification, together with his confirming written statement,[17] made to one of the officers thereafter, was sufficient to establish probable cause to arrest plaintiff. The officers had no reason to question the veracity of the witness's identification.  His statement was detailed, including a description of plaintiff handing the weapon to two or three females who were nearby. (Def.s' Ex. FF) (Dkt. No. 132-35).  Seven .40 caliber casings were found where Mr. Singh told defendant Blake that plaintiff had fired the gun.[18] (Blake Rep't) (Def.s' Ex. AA) (Dkt. No. 132-30).  This information, coupled

---

[15] It is odd that plaintiff would be speaking to the officers one minute and running the next minute after the plaintiff's identification was announced by defendant Blake over the officers' radio.

[16] Plaintiff also disputes that he was seen walking from Shonnard Street and now states that he was never on Shonnard Street. (Pl.'s SOF ¶ 13). However, he testified at his deposition that he parked his truck on Shonnard Street. (Pl.'s Dep. at 96) (Dkt. No. 132-4).  Even plaintiff's mother testified that plaintiff parked on Shonnard Street that night. (Roman Dep. at 45) (Dkt. No. 144-2).

[17] Mr. Singh gave a very detailed statement to Officer Sheehan, which included a direct view of plaintiff firing a gun into the air, a description of plaintiff and his clothing, and of plaintiff handing the gun to a group of women, who disappeared in a car. (Def.s' Ex. FF - Singh Statement) (Dkt. No. 132-35); Def.s' SOF ¶ 21; Sheehan Aff. ¶¶ 9-10; Sheehan Rep't at 2 (Dkt. No. 132-34)).

[18] Defendant Blake testified to the events of December 26, 2015 at plaintiff's bail revocation hearing relative to the July 2015 incident. (Def.s' Ex. GG at 4-9) (Dkt. No. 132-36).  Defendant Blake's testimony included an account of Mr. Singh's identification, defendant Blake's radio alert to officers who were standing with plaintiff, plaintiff's attempt at escaping the officers once the identification was relayed to them, and the discovery of the shell casings in the vicinity of where plaintiff was standing. (*Id.*)  On cross-examination, defendant Blake testified that Mr. Singh pointed to plaintiff and described the clothing he was wearing, and on re-direct examination defendant Blake testified that Mr. Singh told him that the gun was "handed off to females in an unknown car." (*Id.* at 9).  Based on the evidence presented at the bail revocation hearing, including a consideration of plaintiff's witnesses, the court found that there was "reasonable cause to believe he committed a new violent felony while currently on bail for a violent felony of assault in the first degree . . . ." (*Id.* at 56).  Bail was revoked on the July 2015 charges after the hearing on January 4, 2016. (*Id.*)  Bail was set at $100,000.00 on the December 26, 2015 incident. (*Id.* at 57).  Plaintiff was subsequently released at the end of February or beginning of March 2016. (Pl.'s Dep. at 130-31).

with plaintiff's attempt at evading the arrest upon his identification as the shooter are sufficient to establish that any reasonable fact finder would conclude that the officers had probable cause to arrest plaintiff on December 26, 2015.

Once a police officer or officers have probable cause, they need not explore "every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 128 (2d Cir. 1997).  Finally, the eventual outcome of the prosecution, including dismissal, is not determinative of probable cause to arrest.  *Hahn v. County of Otsego*, 820 F. Supp. 54, 55 (N.D.N.Y. 1993), *aff'd*, 52 F.3d 310 (2d Cir. 1995).  *See also Slaughter v. Mahar*, No. 5:19-CV-0305 (TWD)*, 2021 WL 2227887, at *6 (N.D.N.Y. June 1, 2021) (citing *Danford v. City of Syracuse*, No. 5:09-CV-307 (GTS/ATB), 2012 WL 4006240, at *7 (N.D.N.Y. Sept. 12, 2012)).  Thus, the fact that the weapons charges against plaintiff relating to the December 26, 2015 incident were dismissed does not change the finding that the officers had probable cause to arrest plaintiff at the time,[19] and plaintiff's Fourth Amendment false arrest claim against officers Blake and Giarrusso for plaintiff's December 26, 2015 arrest may be dismissed.[20]

---

[19] Despite a grand jury subpoena, and later, a material witness warrant obtained by the prosecutor,  Mr. Singh failed to appear for the grand jury presentation, originally scheduled for December 31, 2015. (Def.s' SOF ¶ 41; Def.s' Ex. II (Material Witness Warrant) (Dkt. No. 132-38)). On February 17, 2016, the Grand Jury met without the benefit of Mr. Singh's testimony and voted a "no bill" for the felony weapons charges, but voted to "true bill" plaintiff on the misdemeanor resisting arrest charge. (Def.s' Ex. HH - Grand Jury Order) (Dkt. No. 132-37).  Plaintiff was released on or around February 24, 2016. (Def.s' SOF ¶ 41; SAC ¶ 4, p. 5).

[20] During his deposition, plaintiff testified that the basis for his false arrest claim relating to the December 26th arrest is that he did not have a weapon in his possession, there was no weapon located, and no one came forward to say that he or she was "shot at."  Plaintiff appears not to have understood the bases upon which he was charged with possession of a weapon and reckless endangerment. (Pl.'s

## 2.    May 18, 2016 (Defendants Henderson, Ripley, and Decker)

The plaintiff essentially claims that he just happened to be walking by 309 Merriman Avenue on the date that the defendants were executing their warrant and was falsely arrested as he was swept up in the operation. (SAC ¶ 5).  In an effort to establish the "totality of the circumstances," defendants have added a great deal of information regarding the May 18, 2016 incident to their summary judgment motion.

Defendants state that the events surrounding this incident resulted after a "long-term investigation targeting suspected illegal activities committed by residents and known associates of 309 Merriman [Avenue]" in the City of Syracuse. (Def.s' SOF ¶¶ 46-49).  The investigation began in March of 2016, when the police received information about illegal drug activity taking place in and around 309 Merriman. (Def.s' SOF ¶ 48).  During the course of that investigation, controlled purchases were made from individuals at the property, and actual buyers were stopped as they left the area. (Def.s' SOF ¶ 48; Affidavit of Officer Scott Henderson ("Henderson Aff")[21] ¶15).  As a result of the investigation, defendant Henderson applied for a "high risk"[22] search warrant for the property. (Def.s' SOF ¶ 48 & Def.s' Ex. OO - Search Warrant Application (Dkt. No. 132-44)).

_____

Dep. at 140-41).  Even if all of plaintiff's statements are true, the totality of the circumstances with which the officers were presented sufficed to establish probable cause to arrest plaintiff.

[21] Defendants' Ex. P (Dkt. No. 132-19).

[22] A "high risk" search warrant indicates that officers might be met with "armed resistance based on the identified suspects" when executing the warrant. (Def.s' SOF ¶ 47).  Such suspects include "those known to have a propensity for violence and gun-related crimes—and the specific criminal activities involved (i.e., drug and gun possession)." (Def.s' SOF ¶ 47) (citing Henderson Aff. ¶ 12; Affidavit of Officer Robert Ripley ("Ripley Aff.") ¶ 3 (Def.s' Ex. U) (Dkt. No. 132-24)).

In addition to the information regarding drug sales, the warrant application stated that many of the subjects were part of the Esteras/Frias/Claudio family which resided at 309 Merriman in both the first and second floor apartments. (*Id.*)  The "*location, it[]s occupants, their associates, and the involved subjects of this investigation have been the source of numerous criminal incidents over the past ten years* which have involved drug sales/possession, weapon sales/possession and violent acts to include assaults, stabbings, shots fired, and shooting with injuries." (*Id.*) (quoting Def.s' Ex. OO – Search Warrant and Application at 5) (emphasis in original)).

Plaintiff maintained a close association with the Esteras/Frias/Claudio family[23] and had a child with Mr. Frias's sister, Ms. Emely Frias.[24]  Defendants have included the depositions of Alex Claudio, Raphael Frias, and Adrien Esteras as exhibits to their summary judgment motion. (Def.s' Ex. B (A. Claudio Dep.); Ex. C (C. Frias Dep.) and Ex. D (A. Esteras Dep.)) (Dkt. Nos. 132-5, 132-6, 132-7).  According to these individuals, 309 Merriman was an "active" residence, which was "well-known" to the community and to the Syracuse Police Department for drug and weapons-related activities. R. Frias Dep. at 15-16; A. Claudio Dep. at 14-17).  Mr. Claudio specified that an individual could obtain any drug that he or she wanted at that location, or "50 feet in

---

[23] Mr. R. Frias and Mr. A. Claudio were cousins. (R. Frias Dep. at 14).  A. Claudio and A. Esteras are brothers. (A. Claudio Dep. at 82).

[24] Plaintiff does not dispute that he maintained a close relationship with this "family," but states that he had a "daughter," not a "son" with Ms. Frias, and that he was not really a member of "this family." (Pl.'s SOF ¶ 50).  Plaintiff's factual dispute is not "material," and the defendants' statement of material facts contains a typographical error because it is clear from the rest of the record that plaintiff has a daughter with Ms. Frias.  In addition, whether plaintiff considers himself a member of the family is not relevant to the issue of probable cause, and he does not dispute that he has a close association with the named individuals.

any direction." (A. Claudio Dep. at 16-17).

These individuals further testified that during May of 2016, plaintiff would stop by or be around 309 Merriman "every day"[25] to "hang out." (Def.'s SOF ¶ 51) (quoting A. Claudio Dep. at 12-13; R. Frias Dep. at 12; Emely Frias Dep. at 17 (Dkt. No. 132-10); A. Esteras Dep. at 11).  According to Keila Carrasquillo, the mother of some of plaintiff's children, plaintiff would be at 309 Merriman "Monday through Sunday" hanging out, selling drugs and/or gambling.[26] (Def.s' SOF ¶ 53; Carrasquillo Dep. at 25, 36-37).

Prior to the execution of the search warrant on May 18, 2016, the officers conducted surveillance of the area of 309 Merriman Ave. (Def.s' SOF ¶¶ 56-59; Henderson Aff. ¶¶ 14-17).  Drug related transactions occurred throughout the day, with multiple sellers acting "in concert" to facilitate the transactions. (Def.s' SOF ¶ 54; Henderson Aff. ¶ 13).  "Individuals would have different responsibilities, including acting as lookouts, possessing firearms for security, and possessing/concealing narcotics and/or money." (Def.s' SOF ¶ 55) (citing Henderson Aff. ¶ 13).  The use of numerous individuals, with differing responsibilities, was an effort to interfere with law enforcement's ability to investigate and prevent the criminal activity. (Henderson Aff. ¶ 13).

---

[25] Plaintiff does not dispute that he often went to 309 Merriman Ave., but disputes that he went "every day." (Pl.'s SOF ¶ 52).

[26] Plaintiff disputes Ms. Carrasquillo's testimony in general because, according to plaintiff, Ms. Carrasquillo has been known to call the police and "falsify" information about the plaintiff. (Pl.'s SOF ¶ 53).  This factual dispute is not material to this court's ultimate decision because there are other sufficient facts upon which defendants relied to establish probable cause to arrest plaintiff on May 18, 2016.

During their surveillance on the day of the May 18, 2016 raid, officers observed multiple individuals loitering in and around the front yard of 309 Merriman.  They also observed individuals arriving and making brief hand-to-hand transactions with members of the group, before quickly leaving the area. (Def.s' SOF ¶¶ 56-57) (citing inter alia Henderson Aff. ¶ 14).  The officers stopped at least two cars after they left 309 Merriman Avenue that day.  In each of the cars, the officers discovered individuals who had just purchased heroin at 309 Merriman. (Def.s' SOF ¶¶ 58-59) (citing Henderson Aff. ¶¶ 16-17).

The officers executed the search warrant at 1:45 p.m. (Def.s SOF ¶ 60; Henderson Aff. ¶ 19).  Members of the Syracuse Police Department SWAT team were hidden in the back of a "box truck" that pulled up to the west side of the driveway directly in front of 309 Merriman. (Def.'s SOF ¶ 60) (citing Henderson Aff. ¶19; Claudio Dep. at 24; R. Frias Dep. at 25).  Some of the officers, including defendant Decker were designated at "runners," whose job it was to pursue any suspects who attempted to flee on foot. (Def.s' SOF ¶ 61; Affidavit of Officer Jeremy Decker ("Decker Aff.") ¶ 8 - Def.s' Ex. L (Dkt. No. 132-15)).  Other officers, including Officer Joel Dorchester and defendant Robert Ripley were designated as "operators," whose job it was to make entry into the residence. (Def.s' SOF ¶ 62; Ripley Aff. ¶ 6; Affidavit of Joel Dorchester ("Dorchester Aff.") ¶ 8 (Def.s' Ex. M) (Dkt. No. 132-16)).  Defendants Decker and Ripley were both familiar with plaintiff and the risk that he posed to members of law enforcement. (Def.s' SOF ¶¶ 63, 64; Decker Aff. ¶ 10; Ripley Aff. ¶ 2).

Contrary to plaintiff's assertion that he was just walking by the Merriman address

at the time of the raid, he was a very frequent visitor to the area, even if the court accepts plaintiff's assertion that he was not there "every day."  The investigation of the illegal activities occurring at 309 Merriman Avenue had been ongoing since March of 2016.  In addition to stating that family *and* associates were involved in the narcotics business, defendant Henderson's warrant application also noted that

> The information also advised that the subjects will use "lookouts" acting as counter surveillance and secrete narcotics and weapons in stash locations on this property as well as surrounding vacant properties.

(Def.s' SOF ¶ 48).  It is clear from the language of the warrant application that the named subjects of the investigation were not the only individuals involved in criminal activity, but their "associates" were also involved, and they were likely to be found in or around 309 Merriman.

The depositions of some of the individuals who were the "targets" of the investigation show that plaintiff was at 309 Merriman almost every day, that he had a daughter with one of the residents of the multi-family home, and that the location was known for its drug, and other criminal, activity. (*See e.g.* A. Claudio Dep. at 12-13, 15-16; R. Frias Dep. at 5, 12-13, 15; A. Esteras Dep. 11, 13). Thus, even if plaintiff was not specifically named in the "investigation" or in the warrant application, the facts that were developed during the investigation and the facts that developed as the officers carried out the raid gave them probable cause to believe that plaintiff committed the crimes for which he was arrested, including constructive possession of the drugs that

were found in the yard, in close proximity to plaintiff,[27] who was standing near the front yard sidewalk area next to the driveway. (Def.s' SOF ¶ 65). Plaintiff was standing near Alex Claudio and Milton Ayala, the latter of whom possessed a concealed firearm and hundreds of packets of heroin in a "fanny pack." (Def.s' SOF ¶¶ 65, 67, 87).

Although plaintiff did not have any drugs on his person at the time of his arrest, he had over $1,000.00 in cash, consistent with the sale of drugs and consistent with the investigation's finding that multiple dealers were involved in facilitating the sale of drugs. (Def.s' SOF ¶ 88). In addition, as argued by defendants, the fact that drugs were discovered on the lawn, near where plaintiff and his associates were located is sufficient to arrest the plaintiff, based on the theory of "constructive" possession of the drugs. In New York, constructive possession requires that a defendant "exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized[.]" *People v. Manini*, 79 N.Y.2d 561, 569 (1992) (collecting cases). Based on the totality of the circumstances, the officers in this case had probable cause to believe that plaintiff had at least constructive possession of the drugs on the lawn.

---

[27] Officers discovered a bundle of heroin near the middle of the front yard, which could have been discarded by a fleeing suspect. (Def.s' SOF ¶ 89). Plaintiff was charged with Third and Seventh Degree Possession of a Controlled Substance in addition to Resisting Arrest (N.Y. Pen. L. §205.30), First Degree Loitering (N.Y. Pen. L. §240.36) and Second Degree Obstructing Governmental Administration (N.Y. Pen. L. §195.05). (Henderson Aff. ¶ 30; Def.s' SOF ¶ 90). The resisting arrest charge stemmed from plaintiff's attempt at fleeing the area after being told by defendant Decker to get down and his behavior as the officers were attempting to place him under arrest (Def.s' SOF ¶¶ 66-74), the obstructing governmental administration charge stemmed from the fact that defendant Ripley had to stop his entry into the house in order to assist defendant Decker in taking plaintiff into custody (Def.s' SOF ¶¶ 69-72), and the loitering charge resulted from plaintiff remaining in a place with one or more persons for the purpose of unlawfully possessing a controlled substance. (Def.s' SOF ¶ 90).

Plaintiff also agrees that defendant Decker told plaintiff to get down on the ground and place his hands behind his back. (Pl.'s SOF ¶ 66; Def.s' SOF  ¶ 66). Although plaintiff maintains that he did not try to run away, Alex Claudio testified that he observed plaintiff *start to run* and try to get away after he was ordered to get down by the officer, even though it may only have been a few steps. (A. Claudio Dep. at 51; Def.s' SOF ¶ 67).  Defendants recognize that flight alone is not sufficient to establish probable cause, but flight may be considered in conjunction with other circumstances, such as time and location, and the police officers' knowledge that a crime had been committed. *See District of Columbia v. Wesby*, 138 S. Ct. at 587; *Morgan v. Superintendent*, 88 F. Supp. 2d 312, 318 n. 48 (S.D.N.Y. 2000) (citing, inter alia, *Sibron v. State of New York*, 392 U.S. 40, 66-67 (1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.") Based on the totality of the circumstances, any reasonable fact finder would conclude that the officers had probable cause to arrest plaintiff on May 18, 2016.

In the alternative, the officers had, at a minimum, "arguable" probable cause for the arrest, and the defendants would be entitled to qualified immunity. *See Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (dismissing false arrest claims, and holding "an officer is entitled to qualified immunity from a federal false arrest and imprisonment claim if he had arguable probable cause to arrest the plaintiff for any

offense, regardless of the offense with which the plaintiff was actually charged.") Given plaintiff's background, his association with the targets of the warrant application, his proximity to the drugs in the yard, and his behavior when approached, the officers would be entitled to qualified immunity on the issue of false arrest for the May 18, 2016 incident.

### 3.     August 7, 2016 (Defendants Blake, Breen, King and Picotte)

On August 7, 2016, at approximately 3:06 a.m., defendant Chad King responded to the 400 Block of Shonnard Street regarding a "shots fired" complaint. (Affidavit of Officer Chad King ("King Aff.")[28] ¶ 11; Def.s' SOF ¶ 95).  Defendant King began driving around the immediate area, and he observed a black 2006 Land Rover on the side driveway of 308 Merriman Avenue, which was an abandoned residence. (King Aff. ¶ 12; Def.s' SOF ¶ 97).  Earlier that evening, at approximately 10:00 p.m., the Syracuse Police Department received a complaint, alleging that four Hispanic males were selling drugs behind 308 Merriman Avenue. (King Aff. ¶ 12; Def.s' SOF ¶ 98).  Plaintiff was specifically named as one of the individuals spotted selling drugs by the complainant. (*Id.*)  Based on the earlier complaint, defendant King used the spotlight on his patrol car and pointed it toward the back of the Land Rover, at which time the vehicle started moving quickly toward the back of 308 Merriman. (King Aff. ¶ 13; Def.s' SOF ¶¶ 99-100).

As the Land Rover turned behind the residence, defendant King saw an individual, who he immediately recognized at the plaintiff, run away from the vehicle,

---

[28] Defendants' Ex. S (Dkt. No. 132-22).

and jump over a wooden fence. (King Aff. ¶ 13; Def.s' SOF ¶ 101).  Defendant King also saw another male, who was later identified as Xavier Jackson, come from the driver's side of the Range Rover, and run through the backyard to jump over the same wooden fence, heading toward Shonnard Street. (King Aff. ¶ 14; Def.s' SOF ¶ 102). Defendant King then radioed to relay his location and to state that multiple occupants of the vehicle, including plaintiff, were fleeing the area towards Shonnard Street. (King Aff. ¶ 15; Def.s' SOF ¶ 103).

Defendant King also searched the backyard of 308 Merriman Avenue for evidence.  In the grass, within a few feet of the front passenger door, he located a .40 caliber Smith & Wesson magazine with what appeared to be live rounds, and he found a firearm on the other side of the wooden fence. (King Aff. ¶ 17; Def.s' SOF ¶¶ 105-106).  The firearm was later determined to be a .40 caliber Smith & Wesson model SD40VE (Serial Number FWL6991), matching the magazine that defendant King found next to the Land Rover. (King Aff. ¶ 17; Def.s' SOF ¶¶ 106). Once the ground search was completed, Defendant King searched the Land Rover and found a large phone on the front passenger dashboard, which displayed a background image of plaintiff when the screen was activated. (King Aff. ¶ 18; Def.'s SOF ¶ 107).

Defendants Blake and Picotte heard defendant King relay over the radio that several males had fled from the 300 block of Merriman, and defendant King states that he heard plaintiff was one of the suspects. (Blake Aff. ¶¶ 21-22; Affidavit of Officer Chad Picotte ("Picotte Aff.")[29] ¶ 8; Def.s' SOF ¶¶ 108-109).  Defendant Blake saw

---

[29] Defendants' Ex. T (Dkt. No. 132-23).

Plaintiff run onto Seymour Street and then turn around and run back southward. Defendant Blake and defendant Picotte, chased plaintiff behind 421 Shonnard Street and placed him under arrest ***without incident***. (Blake Aff. ¶ 28; Picotte Aff. ¶ 18; Def.s' SOF ¶¶ 109-124) (emphasis added).  During the time that plaintiff was being apprehended, Xavier Jackson was also apprehended and gave a statement to Detective Tassini. (Def.'s SOF ¶¶ 142-43).  Mr. Jackson told Detective Tassini that plaintiff had a semi-automatic handgun that night, and Mr. Jackson observed the handgun in the right front area of plaintiff's pants while they were at the Geddes Express Mart sometime after 2:00 AM on August 7, 2016. (Affidavit of Officer John Tassini ("Tassini Aff.") ¶ 7; Def.'s SOF ¶¶ 145-46).

After plaintiff's arrest, defendant Blake returned to the 300 block of Merriman Avenue, where the third occupant of the Land Rover, Adrian Esteras, was placed in the rear of the officer's vehicle. (Blake Aff. ¶ 29; Def.s' SOF ¶ 136).  Mr. Estaras asked to speak with defendant Blake and told him that the gun was not his, indicating that it belonged to plaintiff. (Blake Aff. ¶¶ 31-32; Def.s' SOF ¶ 136).

Defendant Breen states in his affidavit that he arrived at 308 Merriman Avenue to investigate a suspicious vehicle relating to the "shots fired" report in the vicinity of 631 South Geddes Street. (Affidavit of Officer Jacob Breen ("Breen Aff.")[30] ¶ 7). During the investigation, it was determined that location of the incident was actually one street over in the 400 Block of Merriman Avenue. (Breen Aff. ¶ 7).  While on the scene at Merriman Avenue, Breen's assistance was requested for "a ground search

---

[30] Defendants' Ex. K (Dkt. No. 132-14).

beginning at 631 South Geddes Street." (Breen Aff. ¶ 8).

Sergeant Sean Ryan,[31] who had been watching the area, alerted the officers attention to this location, relaying that he witnessed a muzzle flash coming from a male standing on the south side of the street, near an address later determined to be 471 Shonnard Street. (Breen Aff. ¶ 9). He also alerted the other officers that he witnessed a muzzle flash coming from a male standing on the south side of the street, near the same address. (*Id.*)  Sergeant Ryan also stated that the individual had exited a black SUV, possibly a Land Rover or Range Rover, which was parked on the south side of the street just before shooting. (*Id.*)

As a result of the subsequent investigation, defendant Breen found multiple projectile fragments and pieces of copper jacketing in the roadway between 468 and 471 Shonnard Street and located nine .40 caliber casings in the northwest corner of the front yard of 471 Shonnard Street. (Breen Aff. ¶ 10; Def.s' SOF ¶ 127).  This confirmed that there had been a gun fired in that area. (*Id.*)  Defendant Breen also states that the home located at 468 Shonnard Street was struck by gun shots several times, and the residents inside the home confirmed that they heard many loud gunshots, fired directly outside of their residence. (Breen Aff. ¶ 11).

471 Shonnard Street is located very close to the Geddes Express Mart gas station (631 South Geddes Street). (Def.s' SOF ¶ 127).  Defendant Breen also found a blue Jordan t-shirt with a large "92" design and fresh tear on the front, on the east side of 517 Seymour Street. (Breen Aff. ¶ 12; Def.s' SOF ¶ 131). Defendant Breen also

---

[31] The record does not contain an affidavit by Sergeant Ryan.

obtained copy of video footage from a private citizen that showed a male, who he recognized as plaintiff, wearing a t-shirt with a large "92" on the front of it and tight light color pants, raising his right arm and firing a weapon. (Breen Aff. ¶ 12).  The ejected shell casings fell behind him as he fired the weapon. (Breen Aff. ¶ 14; Def.s' SOF ¶¶ 132-34). The casings falling in the video footage are in the same location that defendant Breen found the nine .40 caliber shell casings. (Breen Aff. ¶ 14; Def.s' SOF ¶ 134).

Defendant Breen states that he is very familiar with the plaintiff, both from personal interactions and from the OCAC bulletins regarding Mr. Hasan, which would often display one of plaintiff's booking photographs. (Breen Aff. ¶ 2).  Defendant Breen was also involved in the May 18, 2016 raid, so he had recently seen plaintiff, making his identification more reliable. (Breen Aff. ¶¶ 4-5).  Plaintiff does not dispute that defendant Breen is familiar with his background and knows what he looks like.

In his statement of material facts, plaintiff agreed with or did not dispute most of the facts surrounding the August 7, 2016 arrest.  Plaintiff disputed the statement that defendant Breen had previously initiated a traffic stop involving Mr. Hasan near Avery Avenue in connection with an unrelated shooting. (Def.s' SOF ¶ 133; Pl.'s SOF ¶ 133; Breen Aff. ¶ 13).  This factual dispute is not material because there is no question that defendant Breen had many other interactions with plaintiff and was very familiar with him, even if the previous "traffic stop" is not considered.  Plaintiff does not dispute that there were other incidents during which defendant Breen observed him, including the May 18, 2016 raid.

Plaintiff also disputes that Mr. Esteras told defendant Blake that the gun belonged to plaintiff.[32] (SAC ¶ 6). Defendant Blake's report contains, what the defendant claims, is an important typographical error. (Def.s' SOF ¶ 140; Blake Aff. ¶ 35; Def.s' Ex. PP). The report states, in pertinent part:

> Esteras asked me why he was in the van. I informed him that he ran from the vehicle and a firearm was located near the vehicle. *Esteras stated it was his gun*. I informed Esteras that I believed him and that I thought the gun belonged to Hasan. Esteras then shook his head yes indicating Hasan owned the gun.

(Def.s' Ex. PP) (Emphasis added). At his deposition, plaintiff testified that this report indicates that Mr. Esteras told the officer that the gun was his. (Pl.'s Dep. at 347). Plaintiff has no basis for this allegation, other than the above report, which defendant Blake states contains a typographical error. He meant to write that "Esteras stated it was *[not]* his gun." (Blake Aff. ¶¶ 31, 32, 35) (emphasis added). Defendant Blake relies on the remainder of the paragraph which indicates that Mr. Esteras acknowledged that the gun belonged to the plaintiff. (*Id.*) During his deposition, Mr. Esteras emphatically testified that he never admitted ownership of the gun to "cover for" plaintiff. (Esteras Dep. at 33-34) (Def.s' Ex. D; Dkt. No. 132-7).

Defendants have filed a copy of the video footage obtained by defendant Breen, and the court has had an opportunity to view it. (Def.s' Ex. VV). The description of the incident in defendant Breen's affidavit matches the video footage. In the video, an individual, who defendant Breen knows to be the plaintiff, appears to shoot a gun into

---

[32] Plaintiff also uses this "disputed" fact to support his claim of malicious prosecution which will be discussed below.

the air. (Def.s' Ex. VV - Channel 5 at 3:05:00 a.m.)  The gun cannot be seen as the shots were fired because the individual's right arm extends over the screen.  However, after the shooting, he brings the hand holding the gun behind his back.[33]  At that point it is apparent that the individual has been holding a gun.  The fact that defendant Breen found casings in the area confirms that a gun was fired.[34]

Given the above undisputed facts discussed above and the video which depicts the plaintiff, identified by defendant Breen, shooting a gun, plaintiff cannot seriously argue that the defendants did not have probable cause to arrest him on August 7, 2016. No reasonable fact finder could conclude that plaintiff's claim for false arrest by defendants Blake, Breen, King and Picotte should be sustained.

## V.  **Malicious Prosecution**

### A.    **Legal Standard**

Under New York law, malicious prosecution requires "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). To establish favorable termination,

---

[33] Plaintiff was ultimately acquitted in November 2017 after a three-day trial. (Def.s' SOF ¶ 152).  His acquittal does not change the fact that the officers had probable cause to arrest plaintiff given the totality of the circumstances discussed herein.  In addition, an Onondaga County grand jury indicted the plaintiff. (Def.s' Ex. WW) (Dkt. No. 134) (Sealed). The grand jury's finding of probable cause is sufficient as a defense to false arrest. *See McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) (grand jury indictment establishes probable cause).  It is also important to note that neither Mr. Jackson, nor Mr. Esteras testified at the trial, which could have contributed to the acquittal. (Def.s' SOF ¶¶ 152-53).

[34] In any event, whether the gun was fired is not relevant to the charge of possession and is not material to whether the officers had probable cause to arrest plaintiff.

plaintiff must establish that the state prosecution "terminated in his favor . . . such as to indicate the accused is not guilty." *Lanning*, 908 F.3d 19, 26 (2d Cir. 2018) (citing *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980) (quotation marks omitted)); *see also Kee*, 12 F.4th 150, 161-62 (2d Cir. 2021) (discussing favorable termination standard).  A grand jury indictment presumptively establishes probable cause. *McClellan v. Smith*, 439 F.3d at 145; *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

To initiate a criminal proceeding, one must "play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010). When a plaintiff pursues a claim of malicious prosecution against police officers based on an unlawful arrest, the "intervening exercise of independent judgment" by a prosecutor usually breaks the "chain of causation" unless the plaintiff can show the prosecutor was "misled or pressured" by an officer. *Dufort v. City of New York*, 874 F.3d 338, 352-53 (2d Cir. 2017) (failure to inform grand jury and prosecutors that eyewitness identified defendant in a suggestive lineup solely based on his clothing may rebut presumption of probable cause created by a grand jury indictment and decision to prosecute does not interrupt chain of causation).  An officer may initiate a prosecution "by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. Mar. 31, 2017) (quoting *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014)).

### B.    Analysis

### 1.    December 26, 2015

As stated above, there is no material question of fact that the officers had probable cause to arrest the plaintiff for the December 26, 2015 incident.  The two defendants named in plaintiff's malicious prosecution claim are police officers.  Thus, plaintiff must show that they took part in "initiating" the prosecution. *Ying Li, supra.* In this case, there is no admissible evidence supporting a finding that the officers presented false or misleading evidence to the prosecutor.  In fact, plaintiff testified during his deposition that he was ***not*** claiming that the officers fabricated evidence. (Pl.'s Dep. at 140).

While the grand jury failed to indict plaintiff for the gun charge, it is likely that the determination was based on Mr. Singh's failure to appear, despite the material witness warrant.  As defendants point out, plaintiff was indicted on the resisting arrest charge, and therefore any claim of malicious prosecution against the officers relating to that charge must be dismissed. *McClellan v. Smith*, 439 F.3d at 145;  (Def.s' SOF ¶ 42).

During his deposition, plaintiff testified that his malicious prosecution claim was based on his attorney's statement that the "police department ***in general***" did not "like" the plaintiff, thought he got "away with stuff" in the past, and would not stop harassing him until he went to jail. (Pl.'s Dep. at 138-39, 140) (emphasis added).  Whether the officers "liked" plaintiff or believed that he "got away" with "stuff" in the past, or whether they harassed plaintiff, is not relevant to the issue of whether he was subjected to malicious prosecution, initiated by the officers, relative to the December 26, 2015

incident.  Even if plaintiff's *general* deposition statements were true, given the specific facts surrounding the December 26, 2015 arrest, there is no evidence to show that the prosecution was initiated with malice or that the officers provided false information or withheld information from the district attorney in an effort to prosecute the plaintiff.

Finally, after testimony by the officers, plaintiff's bail, which had been set after the July 10, 2015 stabbing incident, was revoked by the state court. (Def.s' Ex. GG). Plaintiff was represented by counsel at the hearing, the court heard witnesses called by the prosecutor and by plaintiff, and the court specifically found:

> In view of all the testimony, the court finds there is certainly reasonable cause to believe from the direct eye witness identification of the defendant as the shooter and the gun being handed off to females at the location in the cars, that he committed a new felony of criminal possession of a weapon in the second degree, which is a violent felony.

(Def.s' Ex. GG at 56).  The court revoked bail on the plaintiff's July 2015 assault charges. (*Id.*)  Based on all of the above information, there is no evidence supporting the claim of malicious prosecution against the defendant officers regarding the December 26, 2015 incident.  Thus, any claim of malicious prosecution relating to this arrest must be dismissed.

### 2.    May 18, 2016 (Defendants Decker, Henderson and Ripley)

I found above, that the officers had probable cause to arrest plaintiff on the May 18, 2016 charges based upon the investigation and the facts which unfolded during the raid.  Although plaintiff alleged that the officers added the loitering and resisting arrest charges to justify assaulting plaintiff, there is absolutely no evidence supporting this

assertion.  As stated above, the May 18, 2016 incident began as a months-long investigation of 309 Merriman Avenue, its occupants, and others who frequented the area.  The raid recovered weapons and drugs and involved a great deal of coordination among many officers.  As defendants point out, after the raid, when it became clear that some other suspects had pled guilty to acts that were initially attributed to plaintiff, the charges were reduced by the prosecutor. (Def.s' SOF ¶ 92).

On September 30, 2016, Assistant District Attorney Peter Hakes filed a "Reduction of Charges" letter with the Syracuse City Court, reducing plaintiff's Third Degree Criminal Possession charge to Seventh Degree Criminal Possession. (Def.s' SOF ¶ 92).  The letter which accompanied the reduction in charges, stated that other individuals had accepted responsibility for the bulk of the narcotics activity at 309 Merriman, and that the prosecutor believed that plaintiff's charges should be handled as a misdemeanor possession. (Def.s' Ex. DDD).  Plaintiff has failed to show that the police officer defendants initiated the prosecution with malice, and he is not claiming that the defendants fabricated evidence or misled the prosecutor.  Therefore, the malicious prosecution claims relating to the May 18, 2016 arrest must be dismissed.

### 3.    August 7, 2016 (Defendant Blake)

As discussed above, defendants have established that they had probable cause to arrest plaintiff on August 7, 2016.  Given the facts as stated above, including the video depicting plaintiff shooting the gun, there are no additional facts that would establish malicious prosecution by defendant Blake.  In addition, in relation to the August 7, 2016 arrest, the grand jury indicted plaintiff for the Criminal Possession of a Weapon in

the Second Degree, in violation of N.Y. Pen. L. 265.03(3), specifically for possessing a loaded firearm – a .40 caliber Smith & Wesson, Model: SD40VE, serial number FWL6991– at a place other than his home or place of business (a violent felony). (Def.s' SOF ¶ 148).  The grand jury indictment establishes probable cause.[35] *McClellan v. Smith*, 439 F.3d at 145.  Defendant Blake, therefore, bore no further responsibility for the prosecution.  The plaintiff has no basis for his assertion that defendant Blake's report "established" that Mr. Esteras accepted ownership of the gun.  Defendant Blake explained the discrepancy in his report, and Mr. Esteras confirmed during his deposition, that he never made such a statement to defendant Blake.  Any claim of malicious prosecution against defendant Blake relating to the August 7, 2016 arrest must be dismissed.

## VI.   <u>Excessive Force</u>

### A.    **Legal Standard**

In assessing a claim of excessive force, the court must determine "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them." *Lombardo v. City of St. Louis*, __ U.S. __, 141 S. Ct. 2239, 2241 (2021) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  "'A court (judge or jury) cannot apply this standard mechanically.'" *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  The determination involves "'careful attention to the facts and circumstances of each particular case.'" *Id.* (quoting *Graham*, 490 U.S. at 396).

---

[35] The court has reviewed the sealed exhibits submitted by the defendants, including excerpts from the Onondaga County Grand Jury presentation relating to the August 7, 2016 arrest. (Def.s' Ex. WW) (Sealed).

"Those circumstances include 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Id.* (quoting *Kingsley*, 576 U.S. at 397).

"A determination of reasonableness 'requires a careful balancing of the nature and quality of the intrusion on the individual's [constitutional] interests against the countervailing governmental interests at stake,' with the recognition that officers must often make split-second judgments in response to 'tense, uncertain and rapidly evolving' circumstances." *Malave v. Austin*, No. 19-CV-5534 (ENV/SJB), 2021 WL 3603433, at *5 (E.D.N.Y. Aug. 13, 2021) (quoting *Graham*, 490 U.S. at 396-97)) (alterations in original). The facts must be analyzed "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.*

### B.    Analysis

Defendants argue that plaintiff's excessive force claims should be dismissed as to each of the arrests discussed above. The court will address the facts relative to each incident.

### 1.    December 26, 2015 (Defendants Blake and Giarrusso)

After plaintiff was identified as the shooter by Mr. Singh, he fled on foot, pursued by the officers, including defendants Blake and Giarrusso. (Def.s' SOF ¶ 20). Plaintiff had not yet been patted down for weapons. (*Id.*) Defendant Giarrusso states that he saw plaintiff run across South Geddes toward a car wash on the other side of the

street. (Giarrusso Aff. ¶ 10; Hillman Aff. ¶ 10).  Defendant Giarrusso decided to cut around to the north of the car wash, anticipating plaintiff to come out through one of the wash bays. (Giarrusso Aff. ¶ 10).

Plaintiff ran through an empty car wash bay and continued down a hill in a northerly direction. (Hillman Aff. ¶ 10; Jones Aff. ¶ 9; Blake Aff. ¶ 10; Giarrusso Aff. ¶¶ 10-12).  During the chase, Sergeant Hillman states that he fell on the pavement as he reached to grab plaintiff by his clothes. (Hillman Aff. ¶ 10; Jones Aff. ¶ 9).  After getting up, Sergeant Hillman fell again as he ran down the hill toward Amy Street, suffering injuries to his knees, elbows and left hip. (Hillman Aff. ¶ 10).  Defendant Giarrusso states that he caught up with plaintiff on Amy Street, as he slowed down. (Giarrusso Aff. ¶ 12; Jones Aff. ¶ 10; Blake Aff. ¶ 10).

Defendant Giarrusso states that plaintiff then turned around and "squared up" with him. (Giarrusso Aff. ¶ 12; Jones Aff. ¶ 10). Defendant Giarrusso states that he tackled plaintiff to the ground before he could make another move. (Giarrusso Aff. ¶ 12; Jones Aff. ¶ 10).  In doing so, Defendant Giarrusso suffered an injury to his knee. (Giarrusso Aff. ¶ 12).  By the time defendant Blake and Officer Jones caught up, defendant Giarrusso and plaintiff were struggling on the ground. (Blake Aff. ¶ 11; Giarrusso Aff. ¶¶ 12-15; Jones Aff. ¶ 11).  According to the officers, plaintiff placed his hands and knees on the pavement while defendant Giarrusso tried to control his body to prevent him from getting back up and running away. (Blake Aff. ¶ 11; Giarrusso Aff. ¶¶ 12-14; Jones Aff. ¶ 11; Pl.'s Dep. at 286).  Officer Jones states that he grabbed at plaintiff's legs in order to prevent him from getting up. (Jones Aff. ¶ 11; Blake Aff.

¶ 11).

Defendant Blake believed that plaintiff was attempting to get back up prior to being handcuffed and/or searched for weapons. (Blake Aff. ¶ 11; Jones Aff. ¶ 12; Giarrusso Aff. ¶ 13).  Based on this belief, defendant Blake delivered approximately three strikes to the side of plaintiff's head. (Blake Aff. ¶ 13; Giarrusso Aff. ¶ 15; Pl.'s Dep. at 126-27).  After defendant Blake struck the side of plaintiff's head, defendant Giarrusso was able to secure plaintiff's right arm and assist defendant Blake in applying handcuffs. (Blake Aff. ¶ 13; Giarrusso Aff. ¶ 15).  The officers then placed plaintiff under arrest. (Blake Aff. ¶ 15; Jones Aff. ¶ 12).

Plaintiff does not dispute that he led the officers in a chase.  He disputes that he "squared up" against defendant Giarrusso at the fence. (Pl.'s SOF ¶ 24).  Plaintiff claims that he was tackled to the ground from behind. (*Id.*)  Plaintiff claims that he had stopped running and had placed his hands in the air "surrendering" before being tackled. (Pl.'s SOF ¶ 25).  During his deposition, in addition to confirming that defendant Blake punched him on the right side of the face, plaintiff testified that defendant Blake hit him with a stick, and that the officers kicked and punched him. (Pl.'s Dep. at 125-27).

Given the fact-specific nature of these claims, the court may grant summary judgment only where "no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Garcia v. Greco*, No. 05 Civ 9587(SCR/JFK), 2010 WL 446446, at *4 (S.D.N.Y. Feb. 9, 2010) (quoting *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004)).  "To prevail on a motion for summary

judgment, the evidence must show that 'no rational jury could [find] that the force used was so excessive that no reasonable officer would have made the same choice .'" *Id.* (quoting *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir.1995)) (alterations in original).

Defendants have met their burden as to the December 26, 2015 incident. Plaintiff concedes that he ran away from the officers when one of them tried to "grab" him.  Although he states that he did not "hear" that he had been identified as the shooter, plaintiff's knowledge was not relevant.  The relevant inquiry is the objective reasonableness of the defendants' actions, not the plaintiff's state of mind. *See Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene.)  In his statement of material facts, plaintiff disputed that he was told to get on the ground before he ran. (Pl.'s SOF ¶ 18). However, during his deposition, he specifically stated that "They just told me to get the fuck on the ground, and I just said "For what? I ain't do nothing [sic]." (Pl.'s Dep. at 104).  Thus, plaintiff did hear the officers tell him to get on the ground **before** he began running.

The crime involved shots fired, and plaintiff concedes that he had not been searched prior to his attempt at running away.  Thus, the officers could reasonably have assumed that plaintiff was still armed, even if he was reportedly seen giving a weapon to other individuals by the eye witness.  Plaintiff was well known to the officers as an individual who used violence and weapons in the past, and he was currently on bail for, among other things, stabbing a woman.

The officers chased plaintiff for several minutes, and one of the officers fell in an

attempt to grab at the plaintiff's clothes. Defendant Giarrusso concedes that he tackled plaintiff. Defendant Giarrusso states that when plaintiff finally stopped running, he turned to "square off" with defendant Giarrusso, and defendant Giarrusso tackled plaintiff to make sure that he could not access any weapons that he might have had. Plaintiff claims that he simply stopped running the first time that the officer told him to "stop,"[36] and had his hands up when he was tackled. (Pl.'s Dep. at 111). Under either version of these facts, defendant Giarrusso acted reasonably in tackling plaintiff. If plaintiff did turn around to "square up" with defendant Giarrusso, then the defendant could assume that plaintiff was ready to use violence to prevent his arrest. If, as plaintiff suggests, he still had his back to defendant Giarrusso, the defendant could assume that plaintiff might still attempt to run away, as he had already escaped from another officer attempting to grab at his clothes.

Plaintiff claims that when defendant Blake arrived, he hit plaintiff with a baton, plaintiff was then kicked and punched, and then defendant Blake punched plaintiff in the face. (Pl.'s Dep. at 124-26). Defendant Blake states that when he and Officer Jones arrived, plaintiff was struggling on the ground with Officer Giarrusso. (Blake Aff. ¶ 11; Giarrusso Aff. ¶¶ 12-15; Jones Aff. ¶ 11). Defendant Blake states that plaintiff was on his hands and knees, while Defendant Giarrusso tried to control his body to prevent him from getting back up and running away. (Blake Aff. ¶ 11). Officer Jones then grabbed at plaintiff's legs to prevent him from getting up. (Blake Aff. ¶ 11; Jones Aff. ¶ 11).

---

[36] In just one example of plaintiff's inconsistent account of the incident, he first testified in his deposition that the officers "kept yelling 'stop running,'" while shortly thereafter, he stated that he only heard them "that one time." (Pl.'s Dep. at 110-11).

Defendant Blake thought that plaintiff was trying to get back up prior to being handcuffed. (Blake Aff. ¶ 11).  Defendant Blake concedes that he struck plaintiff in the face three times in order to gain control of him so he could be handcuffed. (Blake Aff. ¶ 13; Giarrusso Aff. ¶ 15).  As soon as defendant Blake delivered the blows to plaintiff's face, defendant Giarrusso was able to secure plaintiff's right arm and assist defendant Blake in handcuffing plaintiff.[37]  (Blake Aff. ¶ 13; Giarrusso Aff. ¶ 15).

The balancing inquiry for an excessive force claim may take resistance to arrest into account in determining whether the force used was excessive. *Garcia*, 2010 WL 446446, at *7 (citing *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000)).  In addition, although the extent or severity of the plaintiff's injuries is not dispositive, it is a relevant factor in determining the reasonableness of the force applied. *Id.* (citing *Johnson v. Police Officer # 17969*, No. 99 Civ. 3964, 2000 WL 1877090, at *5 (S.D.N.Y. Dec. 27, 2000)). *See also Garcia v. Greco*, No. 05 Civ. 9587 (SCR/JFK), 2010 WL 446446, at *7 (S.D.N.Y. Feb. 9, 2010) (quoting *Johnson*, *supra*).

---

[37] Plaintiff claimed that a "witness" made a video tape of the assault and posted it on Facebook. (Pl.'s Dep. at 117).  Plaintiff stated that his mother told him about the video. (*Id.*)  However, neither plaintiff, nor defendants have ever identified the mystery videographer, "Francesca," nor has anyone ever obtained the alleged video of the "assault." The court also notes that plaintiff's mother was deposed in this case.  Although Ms. Roman's deposition was not included in the defendants' initial exhibits on summary judgment, plaintiff cited to the deposition, and defendants included the transcript in their reply. (Roman Dep.) (Dkt. No. 144-2).  Plaintiff's mother testified that her son panicked, ran away, and led the police on a chase. (Roman Dep. at 47, 48).  Although she testified that three or four officers tackled him, even plaintiff did not testify to those facts.  Plaintiff testified that defendant Giarrusso tackled him. (Pl.'s Dep. at 124).  Plaintiff testified that defendant Blake arrived after he was tackled and on the ground. (*Id.* at 124-25). However, plaintiff's mother did state that "I don't know if it was a resisting arrest," but "the way they were punching him," it was "like if [sic] he was trying to resist arrest. (Roman Dep. at 48). She stated that she was more than one hundred feet away from the incident. (Roman Dep. at 49). Given the testimony regarding the distance that plaintiff ran, the location of his arrest, and Ms. Roman's admitted distance from the incident, it is unlikely that she was aware of any specific reason for the officers' actions.  However, as discussed above, even if plaintiff's version is credited, the officers acted reasonably in the circumstances.

In *Tracy v. Freshwater*, 623 F.3d 90, 96-98 (2d Cir. 2010), the Second Circuit dismissed three out of four excessive force claims brought by plaintiff as a matter of law, based on the defendants' motion for summary judgment.  In the first situation, the court held that the officer's use of a flashlight to protect himself and to subdue an arrestee who he perceived to be actively resisting arrest was a reasonable response.  The court's consideration of the *Graham* factors included the seriousness of the crime in question, the potential evasion of arrest, the danger posed to the officer, and the plaintiff's effort to resist arrest. *Id. See also Husbands ex rel. Forde v. City of New York,* 335 F. App'x 124, 128-29 (2d Cir. 2009) (under the circumstances presented, the punch was insufficient as a matter of law to support a finding of force beyond what was necessary to subdue plaintiff and apply handcuffs).  In both *Tracy* and *Husbands*, the court also considered the plaintiff's minimal injuries. *Id.*

In this case, plaintiff did not dispute much of the defendants' version of the events. (Pl.'s SOF ¶¶ 20-30).  The statements that plaintiff disputes are not material. Although plaintiff states that he did not "square up" to defendant Giarrusso, this would not prevent defendant from reasonably tackling plaintiff since defendant Giarrusso had been running through the neighborhood at a fast pace in an effort to catch up with him. Plaintiff testified that he was running for approximately three minutes before he stopped. (Pl.'s Dep. at 112) (running for two, three minutes).  In *Tracy*, the court stated that, given that the plaintiff was clearly resisting arrest as he was running away, it was not unreasonable for the officer to respond by diving on top of Tracy and pinning him down so that he could not get back up and continue to flee. 623 F.3d at 97-98.

44

Officer Giarrusso finally caught plaintiff after chasing him through the neighborhood, hurting his knee during the incident, and Officer Hillman fell and injured himself trying to grab at plaintiff's clothes. (Giarrusso Aff. ¶ 12; Hillman Aff. ¶ 10).  As the officers were struggling on the ground with plaintiff, defendant Blake states that he struck the plaintiff three times in the head in order to bring him under control so that the officers could handcuff him and place him under arrest. (Blake Aff. ¶¶ 11-13).  Officer Blake thought that plaintiff was trying to get up before he could be searched for weapons. (Blake Aff. ¶ 11).   Even if, as plaintiff claims, the defendants administered a few additional punches or kicks as they were trying to bring him under control, plaintiff conceded that his injuries were minimal.  He did not seek any treatment, and claims that all he suffered were "bruises, scratches, and scrapes." (Pl.'s Dep. at 142).

Given the violent nature of the crime, plaintiff's identification by an eyewitness, the officers' awareness of the danger posed by plaintiff to the officers, plaintiff's recent history of violence, the possibility that plaintiff could have still been armed, plaintiff's flight when the officers attempted to detain him, and plaintiff's minimal injuries, no rational jury could find that the force used by the officers was excessive.  Plaintiff's excessive force claim relating to the December 26, 2015 arrest may be dismissed on summary judgment.

### 2.   May 18, 2016 (Defendants Decker, Fowler, Henderson and Ripley)

Defendants make a similar argument relative to the May 18, 2016 incident.  In his affidavit, defendant Decker states that at approximately 2:00 p.m. on May 18, 2016,

he exited the SWAT vehicle to execute the raid on 309 Merriman Avenue along with dozens of other officers. (Decker Aff. ¶ 8).  He was one of the first officers out of the van, and was designated as a "runner," meaning that he was tasked with chasing any suspects who tried to get away on foot. (*Id.*)  This also meant that, unlike some of the other officers, he was not dressed in "full raid gear" so that there would be less interference with his ability to chase a fleeing suspect. (*Id.*)

Defendant Decker states that, as he got out of the van, he immediately recognized plaintiff, who was standing in the front driveway, near the sidewalk. (Decker Aff. ¶ 10). Defendant Decker states that he knew the plaintiff to be in good physical shape, and based on his interactions with plaintiff in the past, he believed the plaintiff to be able to overpower an officer during a struggle. (Decker Aff. ¶ 20).  Defendant Decker states that he ordered plaintiff to get on the ground, but plaintiff failed to comply. (Decker Aff. ¶ 12).  Defendant Decker grabbed the plaintiff by the upper body, but he continued to resist going to the ground. (*Id.*)  He went onto his hands and knees, but refused to go down on his stomach, and he refused to place his hands behind his back. (*Id.*) Defendants Ripley and Dorchester each assisted defendant Decker during his interaction with plaintiff. (Decker Aff. ¶ 13).

Defendant Ripley arrived first and states that he attempted to assist defendant Decker in getting plaintiff to the ground. (Ripley Aff. ¶ 8) (Def.s' Ex. U - Dkt. No. 132-24).  Defendant Ripley admits striking plaintiff once in the face with a closed fist for the purpose of bringing him under control. (*Id.*)  When defendant Dorchester arrived to assist, defendant Ripley left to continue his assigned task of searching the house.

46

(Ripley Aff. ¶ 9; Def.s' SOF ¶¶ 72-73).

While defendant Decker was on the ground with plaintiff, Decker was straddling plaintiff's back trying to get him under control. (Decker Aff. ¶ 14). From there, plaintiff's hands were forced behind back. (*Id*.) However, before defendant Decker was able to secure the handcuffs on both of plaintiff's hands, plaintiff pulled his right hand and arm to his side. (*Id*.) Officer Dorchester also states that he struck plaintiff once in the face with a closed fist in order to gain control over his right arm. (Dorchester Aff. ¶ 6). The officers ordered plaintiff to place his right hand behind his back, and they were ultimately able to handcuff both hands. Defendant Decker estimated that the entire incident took around two minutes from the time that defendant Decker exited the van to plaintiff being secured in handcuffs. (Decker Aff. ¶ 14). Defendant Decker observed that Mr. Hasan had minor abrasions to both sides of his face. (Decker Aff. ¶ 14). Plaintiff told defendant Decker that he scraped his face on the sidewalk when he went to his stomach, but refused medical attention. (*Id.*)

After the search of 309 Merriman Avenue was completed, the suspects were assembled in a "staging area" in the front yard. (Dorchester Aff. ¶ 9). Defendant Dorchester states that plaintiff was positioned there with most, if not all, of the other arrestees. (*Id.*) At no time did defendant Dorchester notice that plaintiff was unconscious or in need of medical assistance. (*Id.*) Defendants' police reports are consistent with their affidavits. (Def.s' Exs. JJ (Decker), MM (Ripley), and KK (Dorchester)) (Dkt. Nos. 132-39, 132-40, 132-42).

Plaintiff alleges that he was left unconscious, laying face-down on the ground for

two hours[38] after the beating, while the raid was being executed. (Pl.'s Dep. at 219;

SAC ¶ 5 at p.6).  However, defendants have filed three photographs taken of plaintiff

on the day of the raid, showing that plaintiff is clearly conscious, and he does not

appear to be seriously injured.[39] (Def.s' Ex. NN) (Dkt. No. 132-43).  Plaintiff had a

large scrape on the right side of his face and some small red areas on the left side of his

face.[40] (*Id.*)  In fact, the scrape that appears on the right side of plaintiff's face is

consistent with scraping his face on the ground as he struggled with the officers, which

is the injury that the defendants described in their statements and is consistent with

plaintiff's own deposition testimony. (Pl.'s Dep. at 223-24).  Plaintiff initially testified

that his "whole face was scraped from Officer Henderson's foot scraping [his] face on

the floor." (Pl.'s Dep. at 223).  However, then plaintiff stated that the scrape was "silver

dollar" sized, which is consistent with his photograph. (Pl.'s Dep. at 224). Defendant

Decker states that plaintiff refused medical attention, while plaintiff testified that he

never sought medical treatment, first because defendant Henderson "threatened" him,[41]

---

[38] In their statement of material facts, defendant state that all the arrestees, including plaintiff, were placed in and around the front yard area for approximately two hours, where they were questioned until the area search was completed and a prisoner transport van arrived. (Def.s' SOF ¶ 79).  Plaintiff states that he "agrees" with this statement. (Pl.'s SOF ¶ 79).

[39] During his deposition, Mr. Claudio testified that while plaintiff was being arrested, he did not see anyone punch, kick, or hit plaintiff with an object. (Claudio Dep. at 66).  Mr. Claudio also testified that he never saw plaintiff unconscious, and he saw plaintiff speaking to his uncle and to Ms. Carrasquillo during the time that the arrestees were waiting for the search to conclude. (Claudio Dep. at 68-69).  Mr. Claudio testified that plaintiff's uncle told plaintiff to sit up so that his face could be seen and pictures taken. (Claudio Dep. at 68).  During her deposition, Ms. Frias also testified that plaintiff was conscious during that time. (Frias Dep. at 38-39).

[40] Mr. Claudio also noted this injury. (Claudio Dep. at 66-67).

[41] However, when asked to explain how defendant Henderson "threatened him," plaintiff stated that when someone asked if he needed medical attention, defendant Henderson "blurted out" that

and second, because the nurse at the Justice Center said there was "not much she could do" for him. (Decker Aff. ¶ 15; Pl.'s Dep. at 222-23).  However, plaintiff testified that he did not seek medical attention after he was released a few days later.[42] (Pl.'s Dep. at 225-26).

During his deposition, plaintiff testified that defendant Henderson participated in the alleged assault by putting his foot on plaintiff's neck after plaintiff was handcuffed and lying face-down on the ground. (Pl.'s Dep. at 217).  Defendant Henderson states that he did not arrive on the scene until the suspects were being taken to the front yard assembling area, and the perimeter had been secured. (Henderson Aff. ¶ 21-22; Def.s' SOF ¶ 82).  Plaintiff now states that he "can't dispute" paragraph 82, and states that he "agrees" with paragraph 83, which states that, after defendant Henderson arrived, he questioned each suspect and asked plaintiff about the location of plaintiff's BMW. (Def.s' SOF ¶ 83, Pl.'s SOF ¶ 83)  If plaintiff agrees that defendant Henderson did not arrive until after the suspects had been moved to the fence, and questioned plaintiff at that time, he could not have participated in plaintiff's arrest or his alleged assault, nor could plaintiff have been unconscious the entire[43] time between his arrest and the

---

[42] plaintiff was "fine," that he "just fell," and asked plaintiff to confirm that he just fell.  Plaintiff testified that he felt pressured into agreeing, but there is no indication that defendant Henderson "threatened" plaintiff. (Pl.'s Dep. at 222).  Plaintiff also testified that no one took pictures of him, which is clearly incorrect. (Pl.'s Dep. at 222).

[42] Plaintiff testified that he did not seek medical attention after he was released because his injury would "self-heal," and that he put Bacitracin and cocoa butter on the scrape pursuant to his mother's advice. (Pl.'s Dep. at 226-27).

[43] At his deposition, plaintiff backed off claiming that he was completely unconscious the entire time.  Instead, he testified that he was "breaking in and out," he was hot and dehydrated, he asked if he could sit up, but "they" would not let him, and he was the only one who was left on his stomach. (Pl.'s Dep. at 219).

49

conclusion of the raid.

In addition, at his deposition, plaintiff testified that he was likely mistaken in identifying defendant Henderson as one of the officers who assaulted him on May 18, 2016. (Pl.'s Dep. at 195).  Plaintiff testified that, after reading the police report, defendant Ripley was the only one he remembered. (Pl.'s Dep. at 194).  He stated that "I originally thought [it] was Mr. Henderson, but he [sic] wasn't." (*Id.*)  Plaintiff was not even sure that defendant Decker struck him. (*Id.*)  Plaintiff stated

> . . . I don't remember which one admitted. Was it Officer Ripley? One of them admitted to the -- to the strikes, so I don't want to confuse them on the record.

(Pl.'s Dep. at 194).  Plaintiff then stated that, to the best of his recollection, defendant Ripley was the only one who struck him. (Pl.'s Dep. at 195).  If plaintiff was relying on defendant Ripley's admission, then his testimony that defendant Henderson stood on his neck at some point is clearly inconsistent, and defendant Henderson was not involved in the incident at all. (*Compare* Pl.'s Dep. at 195 *with* 217). Thus, the second amended complaint may be dismissed as to the claim of excessive force against defendant Henderson for the May 18, 2016 incident.

Plaintiff also claimed that defendant Fowler stood by and "witnessed" the assault.[44] (SAC ¶ 5 at p.7).  However, defendants state that former police chief Fowler

---

[44] The court notes that the second amended complaint also stated that Officers Timothy Galanaugh and Mamoun Abraham "witnessed the assault," but plaintiff did not name them as defendants. (*See* Dkt. No. 78 at 5).  These officers have filed affidavits stating that they never witnessed any force used against plaintiff. (Galanaugh Aff. ¶ 13; Abraham Aff. ¶ 7) (Def.s' Exs. N - Dkt. No. 132-17, Ex. I - Dkt. No. 132-12).  In fact, each of the officers state that they were chasing other suspects who were fleeing the area at the time that plaintiff claims he was assaulted and could not have witnessed plaintiff's arrest. (Galanagh Aff. ¶¶ 11, 14; Abraham Aff. ¶¶ 6-7).  Officer Galanaugh confirms that after plaintiff's arrest, he was placed in a staging area in and around the front yard with

arrived at the scene in a business suit, one hour after "everyone" was placed in handcuffs and positioned around the fence, and he did not have any physical interaction with the plaintiff at all. (Def.s' SOF at 84; Ripley Aff. ¶ 10; Breen Aff. ¶ 5).  Plaintiff now "agrees" with the defendants' statement of facts, which is also confirmed by the depositions of plaintiff's co-arrestees that day.[45] (Claudio Dep. at 61-63; R. Frias Dep. at 69-71).  Thus, defendant Fowler could not have seen the alleged assault, and the second amended complaint may be dismissed as to former Chief Fowler.  Even though plaintiff has raised some disputed facts, these allegations are supported only by plaintiff's inconsistent statements.  Defendants have come forward with evidence showing that no rational jury could find in favor of plaintiff.  Based on the totality of the circumstances, the officers acted reasonably in the amount of force that they exerted on plaintiff in order to effectuate the arrest on May 18, 2016, and the court may dismiss this claim on summary judgment pursuant to a *Jeffreys* analysis.

### 3.    August 7, 2016 (Defendants Blake and Picotte)

In the second amended complaint, plaintiff alleges that defendants Blake and Picotte "use[d] excessive force in apprehending plaintiff, punching, kicking, and placing handcuffs extremely tight." (SAC ¶ 6 at pp.8-9).  Plaintiff also seems to allege that after he was placed in the police car, he remained there for two hours with the "heat on high and the windows all the way up." (*Id.* at p.9).  Defendants argue that plaintiff

---

the other arrestees. (Galanaugh Aff. ¶ 14).  Officer Galanaugh did not see plaintiff unconscious at any time, and in fact, states that he spoke with plaintiff briefly "while he was sitting up near the front yard fence." (*Id.*)

[45] Mr. Claudio stated that defendant Fowler showed up after everyone was arrested, at least "an hour" into the raid. (Claudio Dep. at 62-63).

has presented no record evidence in support of these allegations. (Def.s' SOF ¶ 168). Plaintiff simply responds that he "disagrees" with this paragraph. (Pl.'s SOF ¶ 168).

During his deposition, plaintiff concedes that he was running from the officers, and after he had already jumped over one small fence, he finally heard defendant Blake tell him to stop running. (Pl.'s Dep. at 373-77). Plaintiff concedes that he had run up against a second fence which prevented him from going further. (Pl.'s Dep. at 325-26). Plaintiff testified that he stopped running and put up his hands, but that he was tackled to the ground by an officer who he assumed was Officer Blake. (Pl.'s Dep. at 330). Plaintiff testified that he was kicked and punched while he was on the ground. (Pl.'s Dep. at 331). Plaintiff testified that he was kicked "numerous" times in the upper body. (Pl.'s Dep. at 332). Plaintiff testified that "both" officers kicked him, and defendant Blake delivered most of the punches. (Pl.'s Dep. at 332-33). Plaintiff stated that he put his hands behind his back, there were a "few more punches," then eventually he was handcuffed "real tight." (Pl.'s Dep. at 331). Later, defense counsel asked plaintiff whether he was kicked and punched before he was handcuffed, and plaintiff stated "both." (Pl.'s Dep. at 334). Defense counsel clarified, "before and after," and plaintiff answered in the affirmative. (Pl.'s Dep. at 334). Plaintiff testified that he subsequently asked defendant Blake to loosen the handcuffs, but defendant Blake refused to do so. (Pl.'s Dep. at 378-79). Plaintiff testified that he did not ask for medical attention and suffered "minor"[46] injuries as the result of the force used by the defendants. (Pl.'s Dep. at 352-53). Plaintiff also testified that he was not sure who Officer Picotte was, and he

---

[46] He stated that he suffered "bruises" on his face and body, and that his hands were "swollen" as a result of the tightness of the handcuffs. (Pl.'s Dep. at 352).

was not sure if Picotte was with defendant Blake on August 7th. (Pl.'s Dep. at 373).

Defendants have filed the affidavit of defendant Chad Picotte, who assisted defendant Blake in chasing down and arresting plaintiff on August 7, 2016. (Picotte Aff.) (Def.'s Ex. T) (Dkt. No. 132-23).  Defendant Picotte responded to the "shots fired" complaint at the Geddes Express Mart on August 7, 2016. (Picotte Aff. ¶ 7). Upon arriving at the Express Mart, defendant Picotte heard defendant King relay over the radio that he had spotted a suspicious vehicle in the 300 block of Merriman, and that the occupants fled from the area, heading toward Shonnard Street. (Picotte Aff. ¶ 8).  Defendant Picotte proceeded East along South Geddes Street, toward Shonnard, where he saw two males running, one of whom he recognized as the plaintiff. (Picotte Aff. ¶¶ 9-10).  Defendant Picotte states that he immediately parked his vehicle, got out, and directed both individuals to stop. (Picotte Aff. ¶ 11).  Neither individual complied. (*Id.*)

Plaintiff ran down the driveway of 424 Shonnard Street, re-crossing Shonnard and ran into the rear yard of 421 Shonnard, toward Merriman Avenue. (Picotte Aff. ¶ 14).  The rear yard of 421 Shonnard was overgrown with vegetation. (Picotte Aff. ¶ 15).  Officer Blake joined the chase, and was also entering the yard at 421 Shonnard. (*Id.*; Blake Aff. ¶ 26)  Defendant Picotte told defendant Blake that plaintiff was likely hiding in the vegetation, and both officers moved into the yard, one going to the left side, and the other to the right. (Picotte Aff. ¶ 16; Blake Aff. ¶ 26).  As the officers approached, defendant Picotte heard defendant Blake commanding plaintiff to show his hands. (*Id.*)  Defendant Picotte confirmed that Mr. Hasan was hiding in the bushes right

next to the house underneath some shrubbery.[47] (Picotte Aff. ¶ 17).

In response to the commands, plaintiff crawled out from the bushes on all fours; however, he refused to lay down on his stomach. (*Id.*)  Defendant Picotte then grabbed plaintiff by the left arm to bring him to the ground. (*Id.*)  Defendant Blake states that "Officer Picotte then held Mr. Hasan's arm and I put my hand on [plaintiff's] shoulder and we escorted him to the ground." (Blake Aff. ¶ 27).  Plaintiff was placed in handcuffs without further incident. (Picotte Aff. ¶ 18; Blake Aff. ¶¶ 27-28).

Plaintiff was then frisked for weapons and placed into the rear of defendant Picotte's patrol vehicle. (Blake Aff. ¶ 28).  Defendant Blake's description of the incident is consistent with his contemporaneous report, which states that plaintiff was found hiding in the weeds, and he was "taken into custody without further incident." (Blake Aug. 7, 2016 Rep't at 1) (Def.s' Ex. PP, Dkt. No. 132-45).  Defendant Picotte states that he was in the vehicle with plaintiff for over an hour, the window was open,[48] and he did not notice that it was too hot in the car.[49] (Picotte Aff. ¶ 20).  Defendant Picotte states that plaintiff did not appear injured or in need of medical assistance. (Picotte Aff. ¶ 21).

Unlike the other two incidents involved in this case, the defendants do not claim

---

[47] Plaintiff denied that he was "hiding" in the bushes, but admitted that the yard was "overgrown" and looked like a "plantation." (Pl.'s Dep. at 334-35).  Plaintiff also admitted that he was "in the grass," but did not "hide" in the grass. (*Id.* at 334).

[48] Defendant Picotte states that he remembers specifically that the window was open because he exited the car at one point and plaintiff spoke to him through the open window. (Picotte Aff. ¶ 20).

[49] The court notes that the August 7, 2016 incident occurred after 3:00 a.m., and that at 3:54 a.m. on August 7, 2016, the temperature was only 64 degrees Fahrenheit. https://www.timeanddate.com/ weather/usa/syracuse/historic?month=8&year=2016.  Thus, it is unlikely that plaintiff was suffering any excessive heat in the police car even if the window was rolled up.

that they exerted any "force" on plaintiff, other than that required to pull him out of the grass and guide him to the ground because he refused to get on his stomach.  During his deposition, although plaintiff alleged that defendants kicked and punched him multiple times, plaintiff conceded that his injuries were "minor."[50] (Pl.'s Dep. 352).  Plaintiff stated that he had bruises on his face and body, and his hands were swollen from the handcuffs.[51] (Pl.'s Dep. at 352-53).  Plaintiff's description of his minor injuries was much more consistent with the defendants' description of the incident.  When asked what evidence there was to show excessive force against defendant Blake, plaintiff stated "There's obviously no evidence.  It's just a matter of opinion, me and him." (Pl.'s Dep. at 372).  Plaintiff stated that it was his belief that *any* force used by the police would have been "excessive." (Pl.'s Dep. at 352, 371).

Plaintiff has no witnesses[52] to the alleged assault, no medical evidence, and his

---

[50] Plaintiff never sought medical care, so there is only his testimony that he even had *any* injuries. (Pl.'s Dep. at 352).

[51] Pain and swelling from overly tight handcuffs, without more, is does not rise to the level of excessive force, even when combined with other minor injuries. *See Hamilton v. Broomfield*, No. 95 Civ. 3241, 1998 WL 17697, at *2 (S.D.N.Y. Jan. 2, 1998) (dismissing charges of excessive force pursuant to Rule 12(b)(6) where plaintiff allegedly sustained injuries including a bloody lip, a red mark and swelling on the leg, and pain resulting from overly-restrictive handcuffs).  A Fourth Amendment violation can lie if  "an officer's use of force in handcuffing is plainly unreasonable under the circumstances or where a plaintiff manifests clear signs of [his] distress-verbally or otherwise[.]" *Cugini v. City of New York*, 941 F.3d 604, 613 (2d Cir. 2019).  In this case, plaintiff posed a safety and an escape threat, and even assuming that the handcuffs were tight, plaintiff testified only that he "asked" defendant Blake once to loosen them, and he refused. (Pl.'s Dep. at 378).  He also testified that he asked another officer, who told plaintiff that he was not the one who put them on. (Pl.'s Dep. at 379).  He stated that his hands became numb ten minutes later. (Pl.'s Dep. at 336).  Plaintiff's one request to defendant Blake does not rise to the level of "clear" signs of distress.

[52] Plaintiff listed a variety of "witnesses," although it was unclear why he intended to call them. (Pl.'s Dep. at 356-59).  However, plaintiff testified that none of the proposed witnesses "personally seen [sic] the assault." (*Id.* at 359, 363-64).

allegations are completely inconsistent with the contemporaneous police reports.[53]  In *Dreher v. Syracuse Police Dep't*, No. 5:07-CV-1162 (NPM/GHL), 2010 WL 5070872, at *6 (N.D.N.Y. Dec. 7, 2010), the court granted summary judgment for defendants where "the extent of plaintiff's actual injuries [did] not serve to make credible his assertions that a police car ran over his leg and head, that he was knocked down by a moving police car door that was opened in order to strike him down, or that he was struck repeatedly by an officer's flashlight."  In this case, if the officers had kicked and punched plaintiff before and after he was placed in handcuffs, it is more than likely that he would have had some injury, but plaintiff never even asked for medical assistance. This court finds that defendants Blake and Picotte[54] acted reasonably under the circumstances, and that plaintiff has failed to come forward with any evidence to substantiate his claims of excessive force during his arrest on August 7, 2016.

WHEREFORE, based on the findings above, it is

ORDERED, that defendants motion for summary judgment (Dkt. No. 132) is GRANTED, and that plaintiff's Second Amended Complaint is **DISMISSED IN ITS ENTIRETY AS AGAINST ALL REMAINING DEFENDANTS**, and it is

ORDERED, that the Clerk is directed to enter judgment for **DEFENDANTS**.

Dated: December 10, 2021

Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

[53] *See also* Picotte Rep't. (Def.s' Ex. SS) (Dkt. No. 132-48) (plaintiff found hiding in the vegetation and was taken into custody without incident other than Picotte taking plaintiff's arm and Blake placing his hand on plaintiff's shoulder to take him to the ground for handcuffing. (*Id.*)

[54] In addition, when asked what his basis for claiming excessive force against defendant Picotte, plaintiff testified that he was not sure whether defendant Picotte was the officer with defendant Blake on August 7th. (Pl.'s Dep. at 373).